Jennifer L. Hess (JS3684)
Jacob S. Reichman
RIEMER HESS LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, NY 10016
Phone: (212) 297-0700
Fax:    (212) 297-0730
jhess@riemerhess.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MICHELLE CHICCO,                                    20-CV-10593

                          Plaintiff,               **COMPLAINT**


          -against-                                 ECF CASE


FIRST UNUM LIFE INSURANCE
COMPANY,

                          Defendants.
------------------------------------------------------------------X

        Plaintiff Michelle Chicco ("Chicco"), by her attorneys Riemer Hess LLC, complaining of

Defendant First Unum ("First Unum"), alleges:

        1.      This is an action arising under the Employee Retirement Income Security Act of 1974,

as amended ("ERISA"), 29 U.S.C. §1001, *et seq.*, to recover disability benefits owed to Chicco under

her employer's employee benefit plan ("LTD Plan"), to clarify the rights of Chicco to future benefits

under the plan, and to recover attorneys' fees and costs.

<h3 style="text-align:center;"><u>JURISDICTION AND VENUE</u></h3>

        2.      This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29

U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this

Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the breaches took place in this District and First Unum resides or may be found in this District.

## CHICCO'S PARTICIPATION IN THE
## LONG TERM DISABILITY PLAN

4.      Chicco is a 38-year-old accountant who last worked as a Manager and Tax Accountant for D. E. Shaw & Co., L.P. ("D. E. Shaw")– a multinational investment management firm.

5.      At all relevant times, Chicco was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in the LTD Plan.

6.      At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

7.      At all relevant times, First Unum is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

8.      At all relevant times, First Unum has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

9.      Long term disability benefits under the LTD Plan have been insured in accordance and pursuant to Policy No. LTD 15031847, issued by First Unum.

10.     As an employee at D. E. Shaw & Co., L.P., Chicco was provided with long term disability insurance coverage under the LTD Plan.

## STANDARD OF REVIEW

11.     This case is subject to a *de novo* review because the D. E. Shaw & Co., L.P. LTD Plan document, which governs Plaintiff's claim, does not contain an effective grant of discretionary authority to First Unum.

12.     Even if the LTD Plan document effectively granted discretionary authority to First

Unum, this matter is still subject to a *de novo* review because First Unum failed to comply with the Department of Labor's ("DOL") claims-procedure regulations.

13.     Upon information and belief, First Unum has not even adopted claim procedures in accordance with the DOL regulations.

14.     Due to First Unum's procedural violations, First Unum forfeited its entitlement to any deference granted by the LTD Plan document.

15.     For these reasons, this case is subject to a *de novo* review.

**THE LONG-TERM DISABILITY PLAN'S**
**"REGULAR OCCUPATION" STANDARD OF DISABILITY**

16.  Under the LTD Plan, Chicco is "Disabled" if:

> Unum determines that due to your sickness or injury: 1. You are unable to perform the material and substantial duties of your regular occupation and are not working in your regular occupation or any other occupation or, 2. You are unable to perform one or more of the material and substantial duties of your regular occupation, and you have a 20% or more loss in your indexed monthly earnings while working in your regular occupation or in any occupation. You must be under the regular care of a physician in order to be considered disabled.

**CHICCO'S REGULAR OCCUPATION**
**AS A MANAGER AND TAX ACCOUNTANT**

17.     Chicco is a hardworking young woman who was consistently recognized as a rising star within her firm and a leader within her industry.

18.     Chicco was a loyal employee who started at D.E. Shaw as a tax accountant in April 2007.  She was promoted within five years to the manager position. Subsequently, she continued to be delegated more responsibilities, given more complex assignments on special matters and given more staff to manage, over her years at the firm.

19.     Chicco's regular occupation as a manager and tax accountant, described in more detail below, was highly demanding and stressful.

20.     The cognitive demands of Chicco's regular occupation were exceptionally high.  Her

performance needed to be flawless.  Even one mistake could have profound financial consequences.

21.    Chicco was responsible for: preparing and reviewing tax calculations; staying abreast of tax law changes and industry or regulatory developments; identifying and presenting tax planning opportunities to upper management; monitoring staffing needs; delegating and supervising tax compliance work and ad hoc special projects; and performing all work as necessary to ensure the success of the tax team.

22.    Chicco was required to manage several large teams, which varied with each project. The teams included both individuals from the in-house tax team and outsourced tax professionals from several of the largest multinational accounting firms.  This included: supervising, coordinating and reviewing the work of all other staff; preparing and leading tax technical trainings for the team in the New York City and India office, outsourced staff from accounting firms and the tax advisors of senior employees promoted to partner; and leading meetings between the tax team and other in-house teams to share information or coordinate on projects such as the payroll, accounting and human resource teams.

23.    She also was responsible for traveling to India for 2-3 weeks each year to train her tax team abroad and to meet with senior members of other teams located in the India office.

24.     Physically, Ms. Chicco's regular occupation required (without limitation):

    a.    sitting at a desk for extended periods;

    b.    using a computer for extended periods (i.e., maintaining static positioning of her neck to view the screen while using the keyboard and mouse);

    c.    frequent usage of a phone/other electronic devices;

    d.    safely maneuvering in an office setting to converse with others, attend meetings, etc.;

    e.    occasional travel; and

f.  long hours, often exceeding 8 hours per day and 40 hours per week.

25.  Cognitively, Chicco's occupation required (without limitation):

a.  highly complex analytical thinking, strategic problem solving, and planning;

b.  sustained attention and concentration for extended duration;

c.  mental flexibility and the ability to multitask on a high level;

d.  supervising and leading others while collaborating team efforts; and

e.  reviewing accuracy of highly complex tax calculations that included large volumes of numerical data.

## CHICCO'S HISTORY OF PROGRESSIVE NECK AND BACK PAIN

26.  Starting in 2013, Chicco began experiencing severe neck pain and upper and lower back pain.  In 2016, Chicco came under the care of her current board-certified physical medicine and rehabilitation expert, David Chu M.D., for her symptoms.  Ultimately, her diagnosis included:

a.   cervical spondylosis (degenerative osteoarthritis of the spine);

b.  multilevel cervical disc herniations (with spinal cord impingement);

c.   cervical radiculopathy;

d.  multilevel lumbar disc herniations (with S1 nerve root abutment);

e.  lumbar radiculopathy;

f.  myofascial pain syndrome; and

g.  fibromyalgia

27.  Over time, the severity of Chicco's symptoms increased and progressed.  Typing and sitting at the computer began to further aggravate her symptoms.  Chicco struggled to work with her increasing symptoms for several years, but a tipping point was reached in May 2018.

## UNUM'S INITIAL APPROVAL OF CHICCO'S DISABILITY CLAIM
## AND THE FAILED "RAMP UP" PLAN

28.     By May 2018, Chicco's worsening symptoms prevented her from being able to meet both the physical and cognitive demands of her job.  Her worsening symptoms also prevented her from completing a full workday in accordance with the demands of her job.

29.     Ms. Chicco filed for disability benefits with Unum, alleging disability as of May 2, 2018.

30.     First Unum initially approved Chicco's claim for long term disability benefits effective May 2, 2018 – conceding that Chicco was Disabled due to her conditions.

31.     Shortly after beginning her leave, Chicco underwent two lumbar epidural spinal injections on June 14, 2018 and July 19, 2018, which provided partial, temporary relief.

32.     Indeed, Chicco's treatment and activity modification (*i.e.*, no aggravating work-related activities) allowed her to experience some improvement in the severity of her symptoms over the summer/fall of 2018.

33.     Eager and hopeful to return to work, Chicco and Dr. Chu voluntarily coordinated with First Unum's vocational rehabilitative consultant to implement a "ramp up" plan that could possibly allow Chicco to return to work in her full-time capacity.

34.     The ramp up plan called for Chicco to return to work part-time on November 17, 2018 with significant accommodations.  The plan was for her to gradually increase her hours and return to full time work one month later, by December 17, 2018.

35.     Ultimately, the ramp up plan was not successful, as later confirmed by Dr. Chu.  He called the plan a "failure."

36.     Indeed, as Chicco's work hours increased, Dr. Chu witnessed Chicco's symptoms become more aggravated.  She required another lumbar epidural steroid injection on November 29, 2018, just one week after starting work under the ramp up plan.

37.     Ultimately, Chicco's symptoms rendered her unable to return to work full time on December 17, 2018, as she had hoped to do.   She instead remained part-time after such date.

38.    Dr. Chu further explained:

My understanding of the ramp up plan was that it was meant to provide a trial work opportunity to the patient. In other words, I thought it was a trial that would hopefully facilitate a smooth transition to full time work. The plan failed.. . . . It was not her failure to return to work full time, the plan was a failure. She was not capable despite her best efforts and the accommodations provided. Based on my examinations and in-person clinical evaluations, it became clear to me that full time work was ultimately not an appropriate option as Ms. Chicco attempted to "ramp up' her hours between November and December 2018. The increased work activity resulted in progression of her symptoms. . . This was despite Ms. Chicco's best efforts and compliance.

39.    As Dr. Chu concluded, "It is my opinion that, as of December 17, 2018, Ms. Chicco remained incapable of performing the regular demands of her occupation on a full-time basis, even with accommodations, due to ongoing and aggravated symptoms with part-time work activities."

## FIRST UNUM WRONGFULLY TERMINATED BENEFITS
## DESPITE THE RAMP UP PLAN'S FAILURE

40.    First Unum terminated Chicco's long term disability benefits effective December 17, 2018. First Unum's primary rationale for its termination was Chicco's so-called "failure" to start working full time again under the ramp up plan.

41.    In terminating Chicco's disability benefits effective December 17, 2018, First Unum arbitrarily selected a date by which Unum simply anticipated Chicco to return to full-time work, rather than a date that was supported by the medical evidence.

42.    Indeed, First Unum's benefit termination was riddled with errors, inconsistencies, and contradictions that deprived Chicco of a full and fair review.

43.    First Unum failed to adequately consider the medical evidence, the opinions of Chicco's treating providers, the demands of Chicco's occupation, and Chicco's chronic severe pain.

44.    In terminating her benefits, First Unum incorrectly relied on the reports of its two reviewing physicians, Dr. Richard J. Maguire and Dr. George Blankinship, who never even examined Chicco in person.

45.    Dr. Richard J. Maguire's and Dr. George Blankinship's reports and conclusions were biased, incorrect, unreliable, and conclusory.

46.    First Unum's reliance on the non-examining reports of Dr. Maguire and Dr. Blankinship was unreasonable.

47.    Dr. Maguire's and Dr. Blankinship's reports are unreliable because:

    a.    Their opinions are infected by conflict of interest and bias;

    b.    Their conclusions lack foundation and are conclusory;

    c.    Their conclusions were inconsistent and ignored the weight of the evidence;

    d.    They never spoke with or examined Chicco in-person;

    e.    They failed to consider how Chicco's work activity was aggravating her symptoms; and

    f.    They failed to consider the relevant exertional and non-exertional demands of Chicco's regular occupation.

48.    First Unum's benefit termination letter also improperly categorized Chicco's performance of non-work activity as being evidence of her ability to perform her job.  For example, First Unum's termination letter stated that Chicco can do irrelevant activities, such as: (i) she is occasionally able to run errands or clean, as her pain permits, although she relies on her husband to perform most errands; (ii) she avoids her cell phone and computer when not working to avoid worsening her pain; (iii) she occasionally goes out to dinner; (iv) she drives approximately once per month; and (v) her other activities outside of her house have been limited.

49.    Chicco's job does not require her to clean, go out to dinner or drive.  Her limited ability to do those things is irrelevant for determining her ability to perform her job.  Her avoidance of computers and phone further supports the fact that she was unable to work.

50.    First Unum's benefit termination letter also failed to state what specific information

was missing and/or necessary for Chicco to perfect her appeal.

## CHICCO PERSISTED IN HER PART-TIME WORK
## FROM DECEMBER 17, 2018 TO APRIL 26, 2019

51.    Chicco continued to work part-time to the best of her ability beyond the ramp up plan's end on December 17, 2018 – a strong testament to her motivation.  She did so under close monitoring and ongoing treatment with Dr. Chu through April 26, 2019.

52.    Chicco's continuance of even part-time work beyond December 17, 2018 proved to be a struggle.  Indeed, during this part-time work attempt, Dr. Chu's treatment notes consistently document that Chicco's symptoms were increasing with her ongoing part-time work activity.

53.    Chicco's symptoms remained severe enough that she received a lumbar steroidal injection on December 20, 2018 – just two days after First Unum "expected" her to resume full-time work under the ramp up plan.  Again, this procedure only provided temporary relief.

54.    While still struggling to work part-time, Chicco's symptoms progressed to the point where she received an additional lumbar steroidal injection on January 24, 2019.

55.    On March 25, 2019, she also received a trigger point injection.

56.    On April 26, 2019, Chicco's symptoms had increased to the point that she could no longer continue her work even on a part-time basis.

## CHICCO'S PART-TIME WORK FAILURE
## AND TOTAL DISABILITY BEYOND APRIL 26, 2019

57.    Chicco filed a new long-term disability claim, alleging another period of total disability beginning April 26, 2019.  First Unum consolidated this claim with her prior claim.  Chicco addressed both by appeal, with which she submitted substantial new evidence as detailed below.

58.    Dr. Chu confirmed Chicco became totally disabled as of April 2019 due to symptom progression, despite her effort and compliance.  He stated, "I recommended no work at that stage."

59.    Dr. Chu ordered new diagnostic imaging, dated May 27, 2019, which included:

(a) an MRI of the lumbar spine revealing L5-S1 disc herniation abutting the proximal

S1 nerve roots (bilaterally); and

(b) an MRI of the cervical spine revealing C5-C6 disc herniation deforming the thecal

sac with spinal cord impingement, in addition to disc herniation at C4-C5 and disc

bulge at C6-C7.

60.    Chicco continued to undergo various treatments in 2019 with the hope of returning

to work in some capacity.  These treatments included cervical medial branch blocks performed on

June 13, 2019, as well as invasive radiofrequency ablations at C3, C4, C5, C6 on July 11 and July 17,

2019.  Chicco also continued to undergo physical therapy and follow-up with Dr. Chu.

61.    A functional capacity evaluation ("FCE") was performed in December 2019 by Susan

Greenberg, MS, PT.  The FCE confirmed postural limitations due to severe joint pain and fatigue,

weakness in her extremities and decreased fine motor skills which severely affect her ability to type

and grip objects.

62.    In her report, Susan Greenberg stated:

Ms. Chicco is currently unable to function even at the sedentary physical
demand level due to the high level of dysfunction caused by the above
described symptoms in multiple muscle groups and joints, as well as her
severe fatigue.  She is also not able to tolerate even an 8-hour workday due to
positional intolerances in sitting, increased fatigue with deterioration of
movements as tasks progress, and poor musculoskeletal endurance.  Her
lower scores on the second day of testing further indicate her inability to
perform work activities on a sustained consistent basis.  Should she be given
the opportunity to change positions or rest at will, Ms. Chicco would have to
do so more frequently than an employer would tolerate. She was also noted
to take frequent rest/breaks, which would take her off task and presumably
affect her focus, attention span and concentration.  Furthermore, due to her
condition, she would have trouble traveling to and from locations
international for work.  She certainly could not tolerate the long hours
required in her occupation, which often exceeded 8 hours per day and 40
hours per week.

63. Susan Greenberg concluded that:

Ms. Chicco suffers from a variety of symptoms due to her diseases and

comorbidities, causing profound and complex multi-factorial limitations. She is unable to work in her own occupation as a Tax Manager/Accountant in any capacity due to the chronic nature of her neck, upper/lower back and bilateral shoulder pain, as well as at any time in the near future.

64.     An independent board-certified neurologist, Dr. Igor Stiler, examined Chicco in-person on June 15, 2020 to assess the severity of her conditions and her degree of disability.

65.     Dr. Stiler has no prior or ongoing treating relationship with Chicco.

66.     In addition to examining Chicco in person, Dr. Stiler also conducted a thorough review of the medical evidence available at that time.

67.     To better evaluate Chicco's conditions, Dr. Stiler felt it was necessary to order and obtain updated EMGs. Chicco submitted to an EMG of the bilateral upper extremities, dated June 22, 2020, and an EMG of the lower extremities dated June 29, 2020, respectively. Dr. Stiler reviewed the results prior to rendering his opinion.

68.     Dr. Stiler's independent medical examination report and addendum, dated July 9, 2020 and August 7, 2020, thoroughly describe his findings and conclusions.

69.     Dr. Stiler stated that the June 22, 2020 upper EMG showed "significant abnormalities present indicative of right C5-6 and left C6 radiculopathy. The radiculopathy that was noted on this EMG indicated both active and chronic denervation."

70.     Dr. Stiler stated that the June 29, 2020 lower EMG "indicated abnormalities consistent with bilateral L5 radiculopathy." He further stated that both EMGs "were consistent with findings on my neurological evaluation as well as the findings of the MRI scans revealing multiple cervical disc herniations with spinal cord impingement and lumbar disc herniation and bulging discs."

71.     Dr. Stiler also compared the 2020 EMG results to findings from a prior EMG taken in 2016, when Chicco's symptoms began progressing. Dr. Stiler explained:

[T]here clearly is evidence of a continuation in nerve root dysfunction which was noted in 2016 (before the 12/2018 time in question) and continued to show in 2020. Obviously, this is significant and shows that

there has not been any significant healing of the initial process and it
continues.  This is proof that evidence of lumbar nerve root damage,
leading to the various symptoms interfering with the ability to work, even
in a sedentary employment, was demonstrated initially and continues.

72.     Dr. Stiler agreed with Dr. Chu that part time work exacerbated Chicco's symptoms

and he stated:

It is my medical opinion that the progression and exacerbation of Ms.
Chicco's symptoms with part-time work activity, as documented and
reported, is consistent with the nature of her condition and diagnostic
findings.  The physical activities required to perform her work (i.e.,
prolonged positioning at a desk, using a computer, typing, etc.) on a
consistent and sustained basis would reasonably aggravate her symptoms.
This is due to the involvement of her cervical spinal cord, C6 nerve root,
and L5/S1 nerve roots, and the resulting cervical/lumbar radiculopathy.
It is medically necessary that she avoid aggravating activities to minimize
further progression of her symptoms and maximize the benefits of her
treatment.

73.     Dr. Stiler concluded that:

The combination of abnormalities on the diagnostic studies (MRI scans
and EMGs) as well as those findings of the neurologic examination all
indicate that Ms. Chicco could not carry out the activities of her job and
she is considered **TOTALLY AND PERMANENTLY DISABLED**
from any gainful employment due to the conditions.

74.     In a statement from Dr. Chu dated April 13, 2020, he confirmed, "[T]o date Chicco

continues to experience severe chronic pain when sitting, standing and walking for prolonged periods;

sharp burning pain radiating and escalating at moderate to severe levels; reduced fine motor

skills/dexterity, positional intolerances; disturbances with sleep due to pain and stiffness; and

weakness and pain in her joints."

75.     In his April 13, 2020 statement, Dr. Chu concluded:

[I]t is my opinion that Ms. Chicco has been incapable of performing her regular
duties in a full-time capacity since at least May 2018, even with modifications.
Since at least April 2019, she has consistently remained incapable of
performing her duties or other sedentary work in a full or part-time basis, even
with modifications.  Desk and computer work are simply not appropriate.

76.      In his April 13, 2020 statement, Dr. Chu also state: "This patient is very motivated to improve.  I have no reason to doubt the reported severity of her symptoms, which is consistent with the findings."

## UNUM UPHELD ITS INITIAL BENEFIT TERMINATION ON APPEAL

77.      Despite overwhelming evidence of Chicco's disability, First Unum still refused to pay Chicco benefits by letter dated August 31, 2020.

78.      In upholding its termination of benefits, First Unum still did not conduct an in-person examination of Chicco.

79.      Indeed, First Unum did not add any new substantive or examining evidence to the file.

80.      First Unum merely relied on a May 19, 2020 paper review report from Dr. Scott B. Norris.

81.      Dr. Norris retroactively concluded that Chicco could have returned to full-time work by December 17, 2018 – the date that First Unum arbitrarily picked to resume full-time duties under the ramp up plan.  In doing so, Dr. Norris significantly downplayed the medical evidence and the extensive treatment Chicco received.

82.      Dr. Norris also improperly categorized Chicco's performance of nonwork activities as proof that she could perform her job.  Alarmingly, Dr. Norris even pointed to a pregnancy Chicco had after her second total disability leave began – a fact which is totally irrelevant to her long-standing medical conditions and the ability to perform her own work as a manager and tax accountant.

83.      Dr. Norris rejected and dismissed all evidence submitted with Chicco's appeal, including Dr. Stiler's independent medical examination and the Functional Capacity Evaluation – simply claiming that such reports were "not time relevant."

84.      Dr. Norris also claimed that the Functional Capacity Evaluation was not reliable because Chicco was pregnant – despite the most significant findings relating to her cervical spine and

upper extremities (fine motor skills, dexterity, *etc.*).

85.    The report and conclusions of Dr. Norris were biased, incorrect, unreliable, conclusory, and inappropriately focused on Chicco's pregnant state.

86.    First Unum's reliance on the non-examining report of Dr. Norris was unreasonable.

87.    The report from Dr. Norris together with the addendum were unreliable because:

    a.    He never examined Chicco in-person, which is particularly relevant given the complexity and recurrent, chronic nature of Chicco's conditions;

    b.    He lacked appropriate qualifications to comment on Chicco's conditions;

    c.    He failed to consider all relevant information, including Chicco's relevant regular occupational demands in her specialty;

    d.    His opinion was infected by conflict and bias;

    e.    His conclusions lacked foundation and are conclusory;

    f.    He cherry-picked from the medical evidence;

    g.    He failed to consider the chronic nature of Chicco's condition and the lack of significant improvement; and

    h.    His conclusions are inconsistent with the weight of the evidence.

88.    Dr. David Chu and independent medical examiner Dr. Igor Stiler both provided statements detailing the unreliability of the Norris' opinion as well as their disagreements with Dr. Norris' conclusions.

89.    Dr. Chu criticized Dr. Norris for downplaying the extensive treatment Chicco had received as follows:

> Dr. Norris indicated that the care provided to Ms. Chicco was modest and not consistent with severe impairment that would prevent her from working.  He also claimed that there was no escalation in treatment.  These statements are incorrect, Ms. Chicco has received extensive treatment thus far, much of which has been invasive and caused negative side effects.

90.    Dr. Chu also criticized Dr. Norris for downplaying the findings of the 2019 MRIs which showed multiple disc herniations and bulging discs.

91.    Dr. Chu took issue with Dr. Norris improperly disregarding the functional capacity evaluation from December 2019, which serves as objective evidence that Chicco could not perform her job.  Dr. Chu reiterated that the findings revealed impairments of Chicco's sitting/standing abilities and fine motor function, all of which are necessary for performance of her job.

92.    Dr. Stiler took issue with Dr. Norris' qualifications because he was "not a neurologist" and thus not qualified to comment on many of Chicco's issues.

93.    Dr. Chu notably criticized Dr. Norris' qualifications as follows:

> Dr. Norris is board certified in "family/occupational/aerospace medicine."  He is a generalized physician, and it is unclear whether he is an active practitioner.  I am board certified in physical medicine and rehabilitation.  My qualifications make me better suited to treat and comment on Ms. Chicco's chronic conditions.

94.    Dr. Chu wrote, "Respectfully, I am better positioned to accurately assess Ms. Chicco's functional capacity and work status (from 2018/2019 to date) than Dr. Norris.  Dr. Norris review is only based on his review of the records.  He has no personal knowledge of the patient, whereas I do."

95.    Dr. Chu further criticized Dr. Norris' lack of clinical familiarity with Chicco as follows:

> The fact that Dr. Norris never examined Ms. Chicco is important.  Dr. Norris is retroactively commenting on whether my patient was capable of "ramping" up to full time work in November/December 2018, without ever observing and examining her at that time, and without examining her now.  I, on the other hand, have been consistently and examining the patient in person since 2016.  My most recent evaluation was in May 2020.  I am the one who observed, monitored and coordinate Ms. Chicco's attempt to return to work in a full-time capacity in 2018.  I observed and monitored her as she struggled to work part time through 2019, and I continue to evaluate her today.

96.    Dr. Chu confirmed that Chicco's pregnancy – occurring after her second period of total disability in 2019 – had no bearing on the restrictions, limitations, and work status as he assessed

it throughout the course of this claim.

97.   Dr. Chu explained that Dr. Norris even failed to consider the side effect of medications that Chicco was taking, and the effect they had on her cognitive ability. Dr. Chu noted that "for her pain, Ms. Chicco had taken Cymbalta and Norco, as well as the muscle relaxer Methocarbamol.   These medications caused significant drowsiness and dizziness and lightheadedness."

98.   Dr. Stiler similarly criticized Dr. Norris' opinion.

99.   Dr. Stiler took particular issue with Dr. Norris' view that Dr. Stiler's examination and the 2020 EMGs have no relevance or bearing on Chicco's condition as of December 2018, despite the claim clearly continuing beyond such date. Specifically, Dr. Stiler stated:

> The argument that the information after 2018 is not valid to be considered is not valid in and of itself.
> [. . . .]
> Dr. Norris stated that the examination I performed in 6/2020 was "not time relevant."  Once again, I do not find this to be a valid or reliable conclusion and it is not on a medical or neurologic basis to say that the abnormalities noted on examination and diagnostic studies should not be considered just because of the time they were performed when determining the overall level of disability.  As I just stated, Ms. Chicco had a chronic progressive degenerative process.  It did not stop as of 12/2018.  It is even more relevant that despite the passage of more time, she has had worsening of her findings, her clinical examination and objective electrophysiological studies.

100.   Dr. Stiler concluded, "To a reasonable degree of medical and neurological certainty there is no medical justification leading to the persistent opinions of Dr. Norris."

101.   The medical evidence provided by Chicco demonstrates that she could not perform any other occupation on a consistent, reliable and full-time basis during the relevant period at issue.

**FIRST UNUM'S DISABILITY BENEFIT TERMINATION
WAS NOT BASED ON SUBSTANTIAL EVIDENCE**

102.   First Unum's termination of Chicco's long term disability benefits was not based on substantial evidence.

103.    At no time did First Unum ever avail itself of the right to conduct an in-person medical examination of Chicco, and its decisions were therefore based only on paper reviews, without the benefit of an actual clinical evaluation.  This is particularly relevant given the complexity and recurrent, chronic nature of Chicco's medical conditions.

104.    First Unum's termination of Chicco's long term disability benefits was wrongful and without basis in law or fact.  The termination was made against the substantial weight of the evidence and was arbitrary and capricious.

105.    First Unum's failure to meaningfully consider Chicco's medical evidence is an indication that First Unum was serving its own financial interests, despite its fiduciary obligations to Chicco.

106.    First Unum and its reviewing physicians unreasonably cherry-picked from the evidence to support their conclusions.

107.    First Unum and its reviewing physicians unreasonably rejected all new evidence Chicco submitted in support of her appeal as not being "time relevant," despite inviting Chicco to submit new evidence on appeal.

108.    First Unum has reason to know that rejection of reports submitted by claimants on appeal as "not time relevant" is a widely criticized practice and evidence of arbitrary decision-making.

109.    First Unum also failed to provide a full and fair review to Chicco during her administrative appeal by failing to specify what information was necessary for her to perfect her appeal, and failing to give due consideration to the evidence provided by Chicco's physicians.

110.    The evidence First Unum cites in support of its denial of benefits under the LTD Plan is both inconsistent and self-serving.  It does not meet the "substantial evidence" requirement of the Courts in ERISA litigation.

**UNUM FAILED TO PROVIDE CHICCO A FULL AND FAIR REVIEW**

111.    First Unum failed to provide a full and fair review to Chicco during her administrative appeal by failing to specify what information was necessary for her to perfect her appeal.

112.    First Unum failed to provide a full and fair review to Chicco during her administrative appeal by rejecting all evidence she submitted as "not time relevant," despite inviting her to submit new evidence.

113.    First Unum failed to provide a full and fair review to Chicco during her administrative appeal by failing to give due consideration to the evidence provided by Chicco's physicians.

## UNUM FAILED TO RENDER A TIMELY DECISION ON APPEAL

114.    First Unum's August 31, 2020, appeal decision was untimely under ERISA.

115.    ERISA's claims regulations at 29 C.F.R. §2560.503-1 set forth minimum procedural requirements for plan administrators, like First Unum, including strict deadlines for decision-making on appeals, as set forth in 29 C.F.R. §2560.503-1(i) (commonly known as the "Time Limit Regulation").

116.    Under the Time Limit Regulation, First Unum, as the administrator, was required to decide Chicco's appeal within 45 days of submission, pursuant to 29 C.F.R. § 2560.503-l(i)(l)(i).  First Unum was permitted to exercise one 45-day extension only if it determined that "special circumstances … require an extension of time for processing the claim." 29 C.F.R. § 2560.503-l(i)(l)(i), (i)(3)(i).

117.    Here, June 8, 2020, marks 45 days after First Unum's receipt of Chicco's appeal via email on April 24, 2020.

118.    June 8, 2020 is therefore the first 45-day deadline by which First Unum was required to render a decision on the appeal, unless First Unum was exercised one 45-day extension that satisfied the requirements set forth in 29 C.F.R. § 2560.503-l(i)(l)(i), (i)(3)(i).

119.    First Unum exercised a 45-day extension, making July 23, 2020 the latest possible date for a timely decision.

120.    First Unum did not render its decision on appeal until August 31, 2020 – over one month later than the latest possible deadline under ERISA.

121.    First Unum's failure to render a timely decision on appeal was neither inadvertent nor harmless to Chicco.

122.    Indeed, First Unum deprived Chicco of her right to a timely appeal decision under ERISA so that First Unum could obtain a last-minute addendum report from its biased, non-examining physician, Dr. Norris, and use that report to deny Chicco's appeal.  Waiting for a report from a reviewing doctor is not a valid excuse for First Unum violating the time limit.

### FIRST UNUM'S CONFLICT OF INTEREST

123.    At all relevant times, First Unum's has been operating under an inherent and structural conflict of interest because, on the one hand, First Unum is liable for benefit payments due to Chicco and, on the other hand, each payment issued depletes First Unum's assets.

124.    First Unum's determination was influenced by its conflict of interest.

125.    First Unum's conflict of interest extended to and infected its non-examining paper reviewers, Dr. Norris, Dr. Maguire, and Dr. Blankinship.

**First Unum's Cozy Relationship with Dr. Norris, Dr. Maguire, and Dr. Blankinship**

126.    Neither Dr. Norris, Dr. Maguire nor Dr. Blankinship are impartial physicians.

127.    Upon information and belief, Dr. Norris, Dr. Maguire, and Dr. Blankinship are each repeat players and hired guns for insurers within the disability insurance industry.

128.    Upon information and belief, Dr. Norris, Dr. Maguire, and Dr. Blankinship have conducted reviews in connection with numerous other individuals insured by First Unum.

129.    Upon information and belief, during all relevant times, Dr. Maguire and Dr. Blankinship were in-house, salaried medical consultants employed by First Unum.

130.    Upon information and belief, Dr. Norris is a contractor hired and/or retained by First

Unum, either directly or through a third-party vendor.

131.    First Unum contracts with its paper file medical reviewers, including Dr. Norris, based on their reputation for outcomes in contested cases and the likelihood of support for a claim denial.

132.    First Unum knows, or has reason to know, that its in-house medical consultants and the medical consultants hired and/or retained to complete file reviews serve insurance companies, rather than the individual claimants.

133.    Upon information and belief, First Unum pays substantial sums of money to its medical consultants, whether in-house or independent contractors, to conduct reviews for First Unum's insureds.

134.    Because the medical consultants derive substantial income from performing file reviews for First Unum insureds, the medical consultants have an incentive to provide file reviews that First Unum deems favorable in order to perform future file reviews for First Unum.

135.    First Unum has failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

## COUNT I (LTD Plan)

136.    Chicco repeats and re-alleges the allegations set forth in paragraphs 1 through 135 above.

137.    First Unum had no legal basis for terminating Chicco's LTD benefits.

138.    Under the terms of the LTD Plan, First UNUM agreed to provide Chicco with certain disability insurance benefits under the LTD Plan, in accordance with the terms and conditions set forth therein.

139.     First Unum has failed and refused to pay Chicco the LTD benefits to which she is rightfully entitled, from December 17, 2018 through the present date.

140.    Chicco has satisfied all conditions precedent under the LTD Plan and is thus eligible

to receive benefits beyond December 17, 2018.

141.    First Unum's determination that Chicco is no longer disabled within the meaning of the LTD Plan effective December 17, 2018, is contrary to the terms of the LTD Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

142.    First Unum has financial conflicts of interest with respect to handling, monitoring, and eventually denying Chicco's disability benefits.

143.    First Unum was influenced by its financial conflict of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding to deny Chicco's disability benefits.

144.    The unlawful behavior of First Unum is evidenced by the following:

    a.    Denying ongoing benefit payments to Chicco at a time when it knew that she was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the LTD Plan;

    b.    Unreasonably withholding payments from Chicco knowing her ongoing claim for benefits was valid;

    c.    Unreasonably failing to pay ongoing benefits without having any evidence, substantial or otherwise, supporting its decision to terminate benefits;

    d.    Terminating previously approved benefits in the absence of significant medical improvement;

    e.    Ignoring Chicco's treating providers' assessments of her medical conditions, without any basis or explanation for doing so in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

    f.    Ignoring the results of an independent medical examination performed by Dr. Stiler, without any basis or explanation for doing so;

g.  Relying on non-examining medical consultants to deny a claim supported by the treating providers and the independent examining neurologist, Dr. Stiler;

h.  Dismissing and downplaying the diagnostic testing and objective medical evidence;

i.  Relying on non-examining medical consultants who did not consider or comment on all relevant information, including whether Chicco could perform the regular occupational demands required for her specialty;

j.  "Cherry-picking" and selectively highlighting certain factors in medical or reviewing reports to cast a favorable light on its position, while ignoring the conclusions and reports of Chicco's treating providers regarding the conditions for which they render treatment;

k.  Rejecting and/or discounting new evidence submitted on appeal as allegedly not being "time-relevant," despite inviting Chicco to submit new evidence on appeal;

l.  Completely disregarding Chicco's subjective complaints, her own assessment of her medical conditions, and how they restrict and limit her ability to perform the duties of her regular occupation in her specialty, in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

m.  Engaging in a pattern of procedural irregularities to advance its own corporate interests in terminating benefits, to the detriment of LTD Plan participants;

n.  Failing to provide a "full and fair review" as First Unum was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

o.  Failing to provide Chicco with an adequate description of any additional material or information necessary to perfect her claim in violation of 29 C.F.R. §2560.503-1(g)(1)(iii);

p.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated

to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

q.  Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants; and

r.  Failing to render a timely decision on appeal in accordance with 29 C.F.R. §2560.503-1(i).

s.  Failing to ensure that Chicco's claim and appeal for disability benefits were adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision, as First Unum was obligated to do pursuant to 29 C.F.R. §2560.503-1(b)(7);

145.    First Unum's unlawful behavior and violations of ERISA's procedural regulations were purposeful and harmful to Chicco.

146.    A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), applies to evaluating the actions of First Unum in this case.

147.    First Unum was required to discharge its fiduciary duties "solely in the interests of the participants and beneficiaries of the plan."

148.    First Unum violated the higher-than-marketplace standards that ERISA imposes on insurers.

149.    First Unum breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by Chicco.

150.    Instead, First Unum created a false rationale for terminating Chicco's disability benefits.  First Unum selectively highlighted certain factors in medical reports in order to cast a favorable light on its position while misinterpreting or ignoring the conclusions of Chicco's treating providers about the conditions for which they rendered treatment/evaluation.  First Unum also rejected all new evidence Chicco submitted for lack of "time relevance" – a widely criticized practice

which speaks to the unreliability and unreasonableness of First Unum's position.

151.    First Unum placed its financial interests in reducing its expenses and increasing its profitability above Chicco's interests under the LTD Plan to receive ongoing disability benefits.

152.    Chicco has been forced to bring the instant action as a direct result of First Unum's unlawful benefit denial and violations of the LTD Plan and ERISA.

153.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Chicco is entitled to recover disability benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II (Attorney Fees and Costs)

154.    Chicco repeats and re-alleges the allegations set forth in paragraphs 1 through 135 above.

155.    By reason of First Unum's failure to pay Chicco benefits due under the terms of the LTD Plan, Chicco has been forced to retain attorneys to recover such benefits, for which she has and will continue to incur attorneys' fees.

156.    Chicco is entitled to recover reasonable attorneys' fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREEFORE**, Chicco demands judgment against First Unum:

A.    For the amount of all long-term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.    Clarifying and declaring that the LTD Plan is obligated to pay Chicco long term disability benefits in the future as required by the LTD Plan;

C.    For the costs of this action and Chicco's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(1);

D.    For such other and further relief as may be deemed just and proper by the Court.

Dated:  New York, New York
         December 15, 2020

By:     /s/ Jennifer L. Hess          .
        Jennifer L. Hess
        Jacob S. Reichman
        RIEMER HESS LLC
        Attorneys for Plaintiff
        275 Madison Avenue, 26th Floor
        New York, New York 10016
        (212) 297-0700
        jhess@riemerhess.com